STATE of Tennessee, Appellee,

v.

Michael Lee SAMMONS, Appellant.

Nos. 761 and 772.

Court of Criminal Appeals of Tennessee, at Knoxville.

May 24, 1982.

Robert L. Jolley, Jr., Asst. Atty. Gen., Nashville, Stephen M. Bevil, Asst. Dist. Atty. Gen., Chattanooga, for appellee.

David Haines Rotroff, Mitchell Berger, of counsel, Chattanooga, for appellant.

## OPINION

DAUGHTREY, Judge.

The defendant-appellant, Michael Lee Sammons, was found guilty of three counts of kidnapping a child under the age of 16, for which he received a sentence of one to five years imprisonment on each count. He was also found guilty of first degree burglary and was given an additional five to ten year sentence on this charge. All four convictions arose from the kidnapping of the defendant's daughter, Tiffany Dawn Sammons, on three separate occasions in 1979 and 1980. The defendant was acquitted of a related charge of extortion.

On direct appeal from criminal court, Sammons raises multiple issues for our review. His principal insistence is that he was subjected to double jeopardy when he was cited for contempt in circuit court and was subsequently convicted in criminal court on charges growing out of the same transaction. Immediately after judgment was entered in criminal court, Sammons filed a petition for writ of habeas corpus in circuit court alleging that he was being held

in violation of his constitutional rights under the double jeopardy clause. That action was dismissed on the technical ground that a habeas corpus action may not be substituted for a direct appeal. We have previously ordered the two cases consolidated for purposes of review by this court, because the same issue is presented by both appeals.

In addition to the double jeopardy question, Sammons also challenges the sufficiency of the convicting evidence and takes issue with the validity of procedures utilized in selecting the jury that heard his case, the denial of both a change of venue and a severance, certain evidentiary rulings by the trial judge, the introduction of a pretrial statement Sammons made to Canadian immigration authorities, and the trial court's consecutive sentencing order. After a review of the record, we find that the defendant is entitled to limited relief in this case, as set out below.

In July 1978, Michael Sammons and Karen Grant (Sammons), then a medical student, obtained a divorce. An Arkansas court awarded Karen Grant the custody of the couple's two-year-old child, Tiffany Dawn Sammons, and the parties agreed that the defendant would have visitation privileges with Tiffany every other weekend, one evening per week, alternate holidays, and for two weeks during the summer. A problem[1] developed with the defendant's exercise of his visitation rights, and he was thereafter permitted to be with Tiffany only in the presence of a court deputy or other guard.

After Karen Grant finished medical school in June 1979, she moved with her three-year-old child to Chattanooga, where she was scheduled to undertake a medical residency at a local hospital. Soon after this move, the defendant petitioned the Hamilton County court for a change of custody. On July 2, 1979, pending a hearing on the custody petition, the court granted Sammons limited visitation rights with his daughter. At 9:00 A.M. on Saturday,

---

1. Apparently Sammons threatened to or did take the child out of Arkansas, and Dr. Grant petitioned the court to restrict his visitation rights. The trial court in this case sustained an objection to this line of questioning.

July 7, the defendant arrived at Dr. Grant's apartment and took Tiffany for the first visit under the new visitation arrangement.

That night Sammons stayed at a local motel. The next morning he called police to report that his daughter was "missing." Although the defendant maintained at the time that Tiffany had disappeared without his knowledge, he admitted at trial that he had arranged for her disappearance and that later that day he took her to Dallas, Texas, where he was then residing.

A few days later, Sammons called his ex-wife. He still professed not to know where the child was, but told Dr. Grant that if she would agree to joint custody, Tiffany would "show up." Under these conditions, Dr. Grant executed a joint custody agreement and sent it to Sammons, who signed and returned it. In the meantime, Sammons was indicted in Chattanooga for kidnapping and extortion. He voluntarily returned to Chattanooga, where he was cited for contempt in the custody matter and was ordered to jail until he returned the child. Eventually word came that Tiffany could be found in Las Vegas, and Dr. Grant's mother, Betty Grant, flew to Las Vegas, retrieved the child, and brought her back to Chattanooga. The court then released Sammons on a $250,000 bond.

On September 27, 1979, two Kinder-Care teachers spotted the defendant and another man watching the children in the Kinder-Care playground. Tiffany was there at the time and became upset when she saw her father. Three days later, the defendant checked into a Chattanooga hotel and rented a car. That night, when Karen Grant and her mother put Tiffany to bed, they left her bedroom window open about an inch. Tiffany had trouble sleeping, and Mrs. Grant was up with her at 2:00 A.M. At 7:00 A.M. the next morning, Dr. Grant noticed that the door to Tiffany's room was closed. This was unusual, but Dr. Grant thought her mother had closed the door so

that Tiffany could sleep late. It was not until 8:30 A.M., after Dr. Grant had left for the hospital, that Mrs. Grant discovered that Tiffany was missing. Her window was wide open, and a picture in the room had been knocked lopsided. The screen to the window was later found lying on the ground outside.

Karen Grant had no word of her child until December 1979, when she received some recent pictures of Tiffany in the mail. In January 1980, a man Dr. Grant did not know telephoned her and put Tiffany on the line. Tiffany told her mother she was in California. Eventually Dr. Grant was able to secure information about Sammons's whereabouts from this man, who turned out to be a Las Vegas private detective. Through this information Sammons and the child were traced to Toronto, Canada.

On January 24, 1980, Canadian immigration authorities found the defendant and the child living in a Toronto suburb. Sammons was using a false name and had given false information in order to obtain a student authorization to live in Canada. He was arrested; he waived deportation; and he was turned over to FBI agents in Buffalo, New York. Dr. Grant went to Buffalo to get Tiffany. Shortly thereafter, the defendant posted bond in Erie County, New York, and then failed to appear for a scheduled hearing.

On May 26, 1980, just two days short of her granddaughter's fourth birthday, Betty Grant was preparing to take Tiffany to the child care center when she heard a muffled cry outside the apartment and discovered that the child had again been abducted. A neighbor saw the defendant carry Tiffany away from the apartment and heard her cries for her mother.

Seven months later, in January 1981, Florida authorities found the defendant and Tiffany in a Ramada Inn in Manatee County.[2] At this point, the defendant was using the name Gregg Ballard and was in posses-

---

**2.** Sammons had been involved in a drug trafficking operation between Jamaica and Florida that was exposed by an undercover agent and resulted in Sammons's arrest. Information about the drug scheme and pending charges against Sammons in Florida was not allowed to go to the jury in the case at bar.

sion of fake identification for himself and for "Tiffany Ballard." He told Florida authorities that he had taken Tiffany from her mother on a total of five occasions. He also said that if he got out of this "jam," he was going to remove Tiffany from the country permanently.

At trial, Sammons admitted taking Tiffany on the three occasions described above. He maintained, however, that he did not enter the Grant apartment on October 1, 1979. He claimed that at 7:30 that morning he drove by and noticed that Tiffany's bedroom window was open. He said he walked up to the window and began to speak to her, promising to take the three-year-old to Disneyland. He testified that he merely helped the child out of the window, and he denied seeing a screen on the window or on the ground below it.

■ The defendant does not seriously contest the sufficiency of the evidence to sustain the kidnapping convictions, with one exception. He alleges that on July 7, 1979, he did not take Tiffany unlawfully but with permission for a prearranged visit. However, his willful failure to return the child as scheduled is a sufficient "taking" within the meaning of T.C.A. § 39–2602.

■ Sammons also attacks his conviction for first degree burglary, first on the ground of general insufficiency of the evidence, and, second, on the specific basis of failure to prove that the offense, if any, occurred in the night time. Although we think the physical evidence is sufficient to make out a case of breaking and entering the Grant apartment with felonious purpose, we cannot say that the proof is sufficient to prove that the burglary occurred during non-daylight hours. We therefore find it necessary to reduce the defendant's conviction from first to second degree burglary and to adjust the sentence accordingly.

■ After Sammons was arrested in Florida and returned to Hamilton County, the circuit judge before whom his original petition for change of custody was pending held him in contempt for "removing the minor child of the parties on three occasions . . . in violation of the orders of this Court. . . ." The court sentenced Sammons to a six month jail term, but three weeks later, following Sammons's motion to dismiss pending criminal charges on the basis of double jeopardy, the judge who entered the contempt order attempted to rescind it. (This subsequent order noted, among other things, that the sentence for contempt was useless because Sammons was already being held without bond on the criminal charges.)

In treating the defendant's double jeopardy claim, we note first that the circuit court judge who found him in contempt had no authority to impose a six month sentence. Although T.C.A. § 36–835 authorizes incarceration of up to six months for failure to follow a support order, the only contempt power conferred upon the trial court for infractions of visitation and custody orders is found in T.C.A. § 29–9–102. T.C.A. § 29–9–103 limits the maximum fine imposable by the circuit court for such contempts to $50 and the maximum period of imprisonment to 10 days.

Another procedural irregularity in the contempt order, at least for purposes of determining the double jeopardy issue, is the circuit court's failure to specify the dates on which the defendant violated the custody order. The record contains no transcript from the contempt hearing in circuit court or from the pretrial hearing on the motion to dismiss in criminal court. Thus, while it may be assumed that the three occasions mentioned in the contempt order correspond to the three acts of kidnapping proven at trial, that fact is not established by the record. Because of this omission, we are unable to determine whether there has been a double jeopardy violation in this case.

But even if the record did not contain such a crucial flaw, we do not believe that the defendant's contempt citation would constitute a constitutional bar to his subsequent criminal prosecution for kidnapping. As the Tennessee Supreme Court noted in *Maples v. State*, 565 S.W.2d 202, 203 (Tenn. 1978):

The purposes of the general statutes authorizing a court to punish for abuse of its processes and those creating and prescribing punishment for various indictable offenses are so entirely different, and designed to accomplish such wholly different purposes, that we do not find any violation of constitutional principles in imposing punishment upon an offender under both sets of statutes.

The defendant in *Maples* had been previously held in contempt and fined $50 for swearing falsely during a divorce action. He was then tried and convicted of perjury, and the conviction was affirmed by a split decision of the Tennessee Supreme Court. *Maples* relied on an opinion of the Illinois Court of Appeals in *People v. Gray*, 36 Ill.App.3d 720, 344 N.E.2d 683 (1976).[3] There the Illinois court held that a finding of willful contempt and a six month sentence for violation of a protective order in a divorce action barred subsequent proceedings for felonious assault and attempted murder based on the same transaction. *Id.*

The *Maples* court sought to distinguish *Gray* by noting that Maples had been summarily cited for a direct contempt, that is, one occurring in the immediate presence of the court, while Gray had been subject to a separate contempt hearing for extra-judicial conduct in violation of a prior court order. The defendant in the instant case contends that in making this distinction, our Supreme Court intended to endorse *Gray*'s application to indirect contempt citations such as the one now before us.

In view of the broad pronouncement in *Maples* regarding criminal prosecution for conduct also subject to contempt citation, as set out above, we decline to read this result into the *Maples* opinion. Furthermore, we conclude that the indirect contempt in *Gray* is further distinguishable from the legal situation with which we are faced in the instant case.

The Illinois court in *Gray* relied heavily on the United States Supreme Court's opinion in *Bloom v. Illinois*, 391 U.S. 194, 201, 88 S.Ct. 1477, 1481, 20 L.Ed.2d 522 (1968), in which it is noted that "[c]riminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by a fine or imprisonment or both." The fact is, however, that Illinois permits imprisonment for contempt without an upper limit. *People v. Stoller*, 31 Ill.2d 154, 201 N.E.2d 97, 99 (1964). Thus, Gray was sentenced to six months for contempt, and Bloom received a sentence of 24 months. Indeed, the "crime" of which Bloom was found guilty was characterized by the United States Supreme Court as "serious contempt," and the Court held that such "serious contempt are so nearly like other serious crimes that they are subject to the jury trial provisions of the Constitution . . . ." *Bloom v. Illinois, supra*, 391 U.S. at 197, 88 S.Ct. at 1479.

In terms of both its purpose, as articulated by the court in *Maples*, and its substantive provisions, T.C.A. § 29–9–102 can hardly be interpreted as creating the same kind of "serious contempt" or *quasi*-crime that is contemplated under the Illinois scheme. This is manifestly true despite the fact that for some purposes the contempt procedure is treated under Tennessee law as being criminal in nature. *See, e.g., Strunk v. Lewis Coal Co.*, 547 S.W.2d 252, 253 (Tenn. Cr.App.1976) (standard of proof for "criminal contempt" is guilt beyond a reasonable doubt). In contrast to the Illinois cases, for example, there is no requirement in Tennessee that a person sentenced under T.C.A. § 29–9–102 be afforded a jury trial. *Dyke v. Taylor Implement Co.*, 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968). And it has been explicitly held that a Tennessee contempt proceeding is not a criminal prosecution. *Bowdon v. Bowdon*, 198 Tenn. 143, 278 S.W.2d 670, 672 (1955).

The case before us is likewise distinguishable from *United States v. U.S. Gypsum,*

---

**3.** This opinion was subsequently affirmed by the Illinois Supreme Court in *People v. Gray*, 69 Ill.2d 44, 12 Ill.Dec. 886, 370 N.E.2d 797 (1977), despite its conflict with an earlier Illinois deci-

sion, *People ex rel. Scott v. Master Barbers and Beauty Culturists Association*, 9 Ill.App.3d 981, 293 N.E.2d 393 (1973).

404 F.Supp. 619 (D.D.C.1975), also cited by the defendant in the case at bar. There the United States government instituted two actions against the same party in different federal districts on the same day. Although one was for contempt of an earlier injunction against price fixing and the other was a criminal prosecution,[4] the district court noted that the effect would be the same, to the extent that both lawsuits would involve "protracted trial[s]" of some four months duration. *Id.* at 621.

Here, by contrast, the contempt action was initiated by another party to the custody action and not by the State, which undoubtedly was ignorant of the pendency of the contempt petition. Nor was the petition instituted to vindicate the interests of the State, since those interests patently could not be served by the imposition of a 10 day sentence and a $50 fine, the maximum available penalty in the contempt action.

The traditional view has long been that "former jeopardy cannot be invoked on the ground the same act is punishable both as a contempt of court and as a crime." 21 Am.Jur.2d (Rev.) Criminal Law § 250. The reason underlying the rule is a recognition that the two offenses are not the same for constitutional purposes. *See, e.g., Ex Parte Morris,* 194 Cal. 63, 227 P. 914 (1924); *Pompano Horse Club v. State,* 93 Fla. 415, 111 So. 801, 808 (1927); *Ex Parte Allison,* 99 Tex. 455, 90 S.W. 870 (1906); *State ex rel. Duensing v. Roby,* 142 Ind. 168, 41 N.E. 145 (1895). Thus, the courts have concluded, "the fact that an act constituting a contempt is also criminal and punishable by indictment or other method of criminal prosecution does not deprive the outraged court from punishing the contempt." 17 Am.Jur.2d Contempt § 65, citing to *Jurney v. MacCracken,* 294 U.S. 125, 55 S.Ct. 375, 79 L.Ed. 802 (1935); *Delgado v. Chavez,* 140 U.S. 586, 11 S.Ct. 874, 35 L.Ed. 578 (1891); *State v. Howell,* 80 Conn. 668, 69 A. 1057 (1908); *State v. Woodfin,* 27 N.C. 199

(1844); *Fisher v. McDaniel,* 9 Wyo. 457, 64 P. 1056 (1901). Typical of the reasoning utilized to support the majority rule is this analysis by the Connecticut Supreme Court, applied in a case involving an indirect contempt:

> [A] proceeding for contempt while it is of a criminal nature is not a criminal prosecution. Courts having no criminal jurisdiction may punish for contempt. And, when the contempt consists of an act punishable under criminal law, ... the adjudication of contempt will be no bar to a criminal prosecution for [the same transaction]. The proceeding in contempt is for an offense against the court as an organ of public justice, and not for a violation of the criminal law.

*State v. Howell, supra,* 69 A. at 1058 (citations omitted).

Although *Gray, supra,* and *U.S. Gypsum, supra,* may represent a trend away from the traditional rule, it is also possible that the minority view they represent will only be applied in cases involving "serious contempts" which amount in substance to crimes, whatever their superficial characterization may be. *See, e.g., Bloom v. Illinois, supra,* 391 U.S. at 201, 88 S.Ct. at 1481. Such cases represent a concern, implicit in the double jeopardy clause, that an accused not be subjected to a second prosecution for the "same offense." Here, by contrast, we are dealing with two discrete concepts. Indeed, the two statutes involved were intended to serve such entirely different purposes that it is not difficult to draw distinctions between them that will satisfy the so-called *Blockberger* test, adopted by the Tennessee Supreme Court as the proper mechanism for determining identity of offenses. *State v. Black,* 524 S.W.2d 913 (Tenn.1975). T.C.A. § 39–2602 proscribes (1) the unlawful taking (2) of a child under 16 years (3) with the intent to detain or conceal the child from the person having lawful charge. On the other hand, T.C.A. § 29–9–102(3) permits the courts to penal-

4. Under 18 U.S.C. 401(3), contempt of a court order is punishable by fine or imprisonment in the court's discretion. *See also* 15 U.S.C. § 1 and 18 U.S.C. § 401(3) (Sherman Antitrust Act).

ize those who engage in the (1) willful (2) disobediance of (3) a lawful order of the court. The criminal statute thus requires specific intent, while the contempt statute applies only to those who, being subject to the court's order, willfully disobey it, whether with specific intent or not. Of course, one need not be the subject of a court order to be guilty of violating § 39–2602. Thus each statute requires proof of an element that the other does not, and under *Black* they are manifestly not the "same offense."

■ Moreover, whether the same conduct can be subject to multiple punishment has been recognized to be a matter of legislative intent. *Cf. United States v. Whalen,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). As noted above, there can be no doubt that the legislature intended these two statutes to vindicate totally separate and independent concerns. The principle underlying the court's contempt power, *i.e.,* that a court must be able to maintain the integrity of its orders, is so strong that under Tennessee law even erroneous orders must be obeyed, at the risk of a contempt citation. *See, e.g., State v. Ragghianti,* 129 Tenn. 560, 167 S.W. 689 (1914). Of course, our courts have also held that one cannot be twice held in contempt for the same contumacious conduct. *Loy v. Loy,* 32 Tenn.App. 470, 222 S.W.2d 873, 878 (1949). *Accord People v. Columbo,* 25 N.Y.2d 641, 306 N.Y. S.2d 258, 254 N.E.2d 340 (1969), *vacated and remanded, Colombo v. New York,* 405 U.S. 9, 92 S.Ct. 756, 30 L.Ed.2d 762 (1972), *on remand People v. Colombo,* 31 N.Y.2d 947, 341 N.Y.S.2d 97, 293 N.E.2d 247 (1972); *Cf. Menna v. New York,* 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975), *on remand People v. Menna,* 38 N.Y.2d 850, 382 N.Y.S.2d 56, 345 N.E.2d 599 (1976).[5] However, that is not the situation presently before us. Deferring to the court's pronouncement in *Maples,* we conclude that this record, even if the factual basis were properly proven, would not establish a violation of the de-

fendant's constitutional rights under the double jeopardy provisions of the state and federal constitutions.

Nor do we find that the remaining issues require us to order a new trial in this case. The defendant argues, for example, that juror Deborah Meredith should have been excused for cause when she testified that she had heard about the case prior to trial and would "try" to put aside what she had heard, deciding the case based only on what was presented in court. Meredith also said that she had not formed an opinion about the defendant's guilt or innocence, but that she had "felt sorry" for Karen Grant when she saw her on television. Meredith said she "hoped" whatever sympathy she had for Dr. Grant would not influence her decision. While on the cold record these answers seem somewhat equivocal, it is also apparent that the trial judge was satisfied from Meredith's demeanor as well as the content of her responses that she could be impartial. The judge had previously excused all those potential jurors who said that they had formed an opinion or would otherwise be unable to give the defendant a fair and unbiased hearing.

■ Jurors need not be totally ignorant of the facts of the case on which they sit. Even the formation of an opinion on the merits will not disqualify a juror if she can lay aside her opinion and render a verdict based on the evidence presented in court. *Brady v. State,* 584 S.W.2d 245, 249–50 (Tenn.Cr.App.1979); *Lackey v. State,* 578 S.W.2d 101, 103–04 (Tenn.Cr.App.1978). The determination of impartiality must be made in the trial court's discretion, and we find no abuse of that discretion in the instant case.

Nor do we find that the pretrial publicity was by its nature or degree sufficient to require a change of venue. The defendant submitted two newspaper articles that appeared in the weeks immediately before

5. It is also possible that acquittal on criminal charges might bar subsequent contempt proceedings relating to the same transaction on the theory of collateral estoppel, which was found to be part of the double jeopardy provision in *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). *See also* Annot., 88 A.L.R.3d 1089 (1978).

trial, and the affidavits of two attorneys who swore that excitement in the community was at a level which would deprive Sammons of a fair trial. The trial judge deferred action on the motion for change of venue to see whether an impartial jury could be selected, and when he was satisfied that this was possible, he denied the defense motion.

The mere exposure of potential jurors to pretrial publicity does not mandate a change of venue. *See Lackey v. State, supra,* at 103. The matter of change of venue addresses itself to the trial court's discretion, and the reviewing court will respect this decision absent an abuse of discretion. *Rippy v. State,* 550 S.W.2d 636, 638 (Tenn.1977). The record reveals that the publicity in question, although it appeared fairly close to the trial date, was not particularly extensive or sensational. The articles were, if anything, sympathetic toward defendant. Some of the venire members had heard of the case and some had not. Many of those who knew of the case had not paid much attention to the publicity and had not formed an opinion on the case. The record contains no evidence of any public hostility against defendant. Under the circumstances of this case, we find that the trial court did not abuse its discretion in denying a change of venue. *See generally State v. Hoover,* 594 S.W.2d 743, 746 (Tenn. Cr.App.1979).

The defendant further contends that the court erred in refusing to sever all charges for separate trials. Tennessee Rule of Criminal Procedure 14(b)(1) entitles an accused to a severance unless "the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Here, the burglary, the kidnappings, and the extortion (of which Sammons was found not guilty) were part of a common scheme to abduct Tiffany Dawn Sammons. Proof of any of the crimes would have been admissible in a trial of any of the others. *See generally Bruce v. State,* 213 Tenn. 666, 378 S.W.2d 758 (1964); *Jett v. State,* 556 S.W.2d 236, 237–238 (Tenn.Cr.App.1977).

The defendant next complains that the court erroneously allowed a prosecution witness to testify concerning false identification papers found on his person when he was arrested in Florida. Sammons also objects to testimony concerning a photograph of him that was shown to Tiffany's teachers during the investigation of the case. Although the defendant initially contends that these matters were improperly withheld from him prior to trial, the gravamen of his complaint seems to be that the items were "irrelevant and immaterial to the charges against the defendant." To the contrary, we find that testimony concerning the false identification is directly relevant to defendant's "intent to detain or conceal" the child, required under T.C.A. § 39–2602 to make out the offense of "kidnapping children under sixteen." The photograph was relevant to the Kinder-Care teachers' identification of Sammons, and thus there was no error in its introduction.

The defendant also attacks on relevancy grounds the admission of testimony concerning prior kidnapping incidents for which he was not on trial. On direct examination, both Karen Grant and Betty Grant mentioned the prior kidnappings, but the court did not allow the State to inquire concerning these incidents. On cross-examination of Sammons, the State asked about one of the prior kidnappings, and defense counsel did not object to this line of questioning. Instead the defense objected to questions concerning the sale of the couple's house. On appeal, the defendant concedes the relevance of the prior kidnappings evidence, but contends that its prejudicial effect outweighed its probative value. Evidence of the prior kidnappings was relevant to rebut the defendant's contention that the courts had unreasonably restricted his visitation rights, and the prejudicial effect of this proof did not outweigh its probative value.

Sammons further argues that evidence that he was illegally in Canada was irrelevant. However, the fact that Canadian immigration officials found him in pos-

session of an illegal student visa in an assumed name was probative of his intent to conceal the child.

When Sammons was apprehended in Canada, he told immigration officers that because he was having problems with the custody of his child, he had changed his name and had come to Canada so that his ex-wife would not find him. He now claims that this statement was improperly introduced into evidence because the Canadian officers failed to give him *Miranda*[6] warnings.

■■■■ Generally, statements made to foreign officers in their own countries are admissible in a trial here despite a failure to give *Miranda* warnings. *Kilday v. United States,* 481 F.2d 655 (5th Cir.1973). The cases recognize two exceptions to this rule. First, when the conduct of the foreign officer shocks the conscience of the American court, the evidence will be excluded. Second, American courts will exclude the fruits of a foreign interrogation if American officials participated in the interrogation or if foreign authorities acted as agents of the American authorities. *United States v. Heller,* 625 F.2d 594, 599–600 (5th Cir. 1980). The defendant does not allege that the Canadian officials engaged in conduct that would shock the conscience of an American court. Nor does it appear from the record that the Canadian officials acted as agents for any American officials since Sammons made the statement during the course of a Canadian immigration investigation. We thus find no error in the introduction of the statements.

■■■■ When testimony concerning Sammons's statements to Florida authorities was introduced, no contemporaneous objection was entered by the defendant. Hence he has waived any grounds upon which to challenge testimony regarding those statements. *State v. Pritchett,* 621 S.W.2d 127, 135 (Tenn.1981).

The defendant also failed to interject timely objection to the State's opening and closing arguments. He has thus waived objection to the prosecutor's alleged display of emotion. The grounds for the remaining defense objections to the State's argument are not factually borne out by the record.

■■■■ Finally, the defendant argues that the sentences imposed by the jury are excessive, and that the trial court erred in ordering certain of them to be served consecutively. He has failed to brief these issues, however, and they must therefore be considered waived. *State v. McMiller,* 614 S.W.2d 398, 401 (Tenn.Crim.App.1981). Moreover, the kidnapping sentences were within the range provided by statute, and the burglary sentence has been modified. Sammons committed the other felonies while free on bond pending trial in the first kidnapping case. Thus, under T.C.A. § 40–2711(b), the trial court did not have discretion to run the sentences concurrently. Indeed, the State argues that the trial court erred in failing to order consecutive sentencing as to the third kidnapping sentence as well, also on the basis of § 40–2711(b). We direct the trial court to reconsider this matter on remand.

The judgment of the trial court with regard to the defendant's conviction on three counts of kidnapping is affirmed. The judgment is modified to reflect the defendant's conviction of second degree burglary, and the case is remanded for assessment of the proper sentence for this offense. In the absence of objection by the State, that sentence is to be set out at not less nor more than three years imprisonment; otherwise a new penalty hearing must be conducted. The trial judge is also directed to reconsider the question of consecutive sentencing in regard to case number 143627.

DUNCAN and TATUM, JJ., concur.

---

6. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).