IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 13, 2016 Session

**CHRISTOPHER D. NEIGHBOURS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 97-B-1229      J. Randall Wyatt, Jr., Judge**
_____

**No. M2015-01904-CCA-R3-PC – Filed November 14, 2016**
_____

Christopher D. Neighbours ("the Petitioner") appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief. The Petitioner contends that: (1) his due process rights were violated when the State failed to disclose a "potential plea deal" between the State and a cooperating co-defendant, who testified against the Petitioner at trial; (2) he received ineffective assistance of counsel based upon trial counsel's failure to object to the prosecutor's vouching for a witness during closing argument; (3) appellate counsel was ineffective based upon counsel's failure to appeal the imposition of consecutive sentencing; and (4) appellate counsel had an actual conflict of interest when he represented the Petitioner on direct appeal. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Richard C. Strong (on appeal) and J. Alex Little (at hearing), Nashville, Tennessee, for the appellant, Christopher D. Neighbours.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn Funk, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural Background

Following a trial, a jury convicted the Petitioner of first degree felony murder and especially aggravated kidnapping, for which the Petitioner received an effective sentence of life plus twenty-five years' incarceration.[1] On direct appeal, this court summarized the facts at trial, as follows:

On January 22, 1997, the victim, Marcus Deon Fortè, was living in Nashville with a longtime friend, Jerry Robinson, while they both attended American Baptist College. A friend of Fortè's from Ohio, "E," arrived for a visit, and Fortè requested Robinson's help in locating three pounds of marijuana for "E" to purchase.

Robinson, Fortè, and "E" visited Kenji McEwen, a friend of Robinson's, at the Service Merchandise store where McEwen worked. Robinson asked McEwen to help locate someone who would be able to sell "E" three pounds of marijuana. Subsequently, the four men went to McEwen's apartment where McEwen eventually contacted Ronnie McAllister who agreed to obtain the marijuana. McAllister did not have the entire amount of marijuana available, so he in turn contacted Jeffrey Greg Downs. At some point that evening, McAllister, Fortè, and "E" decided to go to Downs' apartment to obtain the marijuana.

Approximately forty-five (45) minutes after the trio arrived at Downs' apartment, Jimmy Garvin and Mitchell Harrison arrived with the marijuana. Downs testified that he believed that Garvin obtained the marijuana from the [Petitioner] but conceded that he was not absolutely certain of that fact. Harrison waited downstairs while Downs, Garvin, McAllister, Fortè, and "E" gathered in Downs' upstairs bedroom to conduct the sale. Shortly after they assembled in the bedroom, "E" pulled a pistol from the waistband of his pants, pointed it at the group, and stole the marijuana. During his exit, "E" threatened Harrison's life if anyone tried to follow him.

After the robbery, Garvin made a cellular telephone call. Additionally, Fortè called Robinson at McAllister's apartment to advise him of the robbery. Robinson testified that Fortè sounded "upset, angry, and excited, all at the same time." Soon after the telephone calls, the [Petitioner] arrived

---

[1] The Petitioner was indicted with two co-defendants, Jeffrey Downs and Mitchell Harrison.

at Downs' apartment with his girlfriend, Terry Garvin. The scene was relatively calm until the [Petitioner] arrived. When the [Petitioner] walked through Downs' bedroom door, he immediately pointed his .35 caliber pistol at Fortè and asked him "if [Fortè's] life was worth three pounds of marijuana." Downs related that, as Fortè tried to explain the events, the [Petitioner] became angry and started pacing, cursing, and waving his gun. Downs testified that, at that point, he became frightened of being blamed because the drug deal had gone awry, and, in order to take the focus off of himself, he hit Fortè on the head with a portable telephone. Garvin then obtained a golf club from Downs' closet and began hitting Fortè in the back with the club. Harrison also struck Fortè. After the golf club broke, Garvin grabbed a nearby piece of wood and struck Fortè on the head. When blood from Fortè's head began to get on the carpet, Downs told Garvin to stop hitting Fortè. McAllister estimated that the beating lasted one hour but was unsure of the exact amount of time; however, he agreed that "it seemed like it went on for a long time." In contrast, Downs testified that the beating lasted only five minutes from the time Fortè was first struck until Fortè's hands and feet were bound. According to McAllister, the [Petitioner] kept his gun pointed at Fortè throughout the beating; however, Downs related that the [Petitioner] kept his gun in his hand but he did not point it at anyone during the assault. McAllister testified that, during the beating, he remained on the bed, too frightened of attracting similar violence to move or say anything.

Downs testified that, after the beating, the [Petitioner] suggested that they bind Fortè's hands and feet with duct tape. Downs obtained the duct tape and, at the [Petitioner's] instruction, first wound the tape across Fortè's mouth and around the back of his head. Next, Downs, Garvin, and Harrison bound Fortè's hands together, followed by his feet. Finally, they bound Fortè's hands and feet together in what was referred to at trial as the "hog-tie position." McAllister related that the [Petitioner] "took the gun, while Marcus [Fortè] was laying on the ground there and they were tying him up, he put the gun to [Fortè's] head right there and asked him if he knew what that was." Additionally, McAllister maintained that he did not hear Fortè make any noise at that time. However, Downs asserted that Fortè groaned, grunted, and tried to pull his hands away from Downs during the taping.

After Fortè was bound, Harrison suggested that they put Fortè in the trunk of Harrison's car. Downs, Garvin, and Harrison carried Fortè downstairs, went out the back door, and placed Fortè in the trunk of Harrison's waiting

car. The [Petitioner], Harrison, and Garvin left the apartment while Downs, Terry, and McAllister stayed behind to clean the apartment. The three individuals who remained at the apartment used cleaning chemicals to remove the bloodstains from the carpet and the walls. Approximately two hours later, the [Petitioner], Garvin, and Harrison returned to Downs' apartment. The [Petitioner] told Downs they needed to dispose of the duct tape, the golf club, and the stick that had been used during the offense. McAllister was allowed to leave, but, before he fled, Garvin told McAllister to pay the money that "E" should have paid or McAllister would be next. Later, Downs, Garvin, Garvin's girlfriend Keanuenue Kipilii, Harrison, Terry, and the [Petitioner] met at Garvin's house. Garvin, Harrison, and the [Petitioner] laughed and joked about a rap song that had been playing on the radio while they drove around with Fortè in the trunk. The lyrics in the song referred to a "body in the trunk" and a "murder after midnight." Soon the group dispersed.

The next day, McAllister, afraid for his life, packed to return home to West Virginia. He asked his mother to send him the money to pay Garvin for the stolen marijuana. Robinson, who had become concerned about Fortè, approached McAllister while McAllister was packing his truck. He pulled a gun and ordered McAllister to reveal what had happened to Fortè. The duo then went to a bank at Harding Place Mall so that McAllister could retrieve the money his mother had sent. A concerned bank teller called the police upon seeing McAllister so distressed. Through questioning McAllister and Robinson, the police then learned of Fortè's disappearance.

Detective Jeff West with the Metropolitan Nashville Police Department began the investigation into Fortè's disappearance. He first spoke with McAllister, who originally minimized his involvement so he could escape to his home in West Virginia. Detective West then contacted Fortè's mother, Gloria Fortè Butler, and learned that she had not heard from her son. In the course of the investigation, Detective West discovered that McAllister's original statement might not be entirely truthful. Accordingly, Detective West traveled to West Virginia and spoke with McAllister again. McAllister subsequently revealed more details of the offense. While Detective West was in West Virginia, other detectives in Nashville learned that Fortè's body had been dumped in Mill Creek.

After he returned to Nashville from West Virginia, Detective West went to Garvin's home to conduct an interview. Garvin initially agreed to take Detective West to Mill Creek to show the detective the location where

- 4 -

Fortè's body had been dumped. Prior to leaving, Garvin requested permission to go into his bedroom to get his shoes. Garvin went into his bedroom, shut the door, and therein committed suicide.

The police began an extensive search of Mill Creek for Fortè's body. Detective West discovered the involvement of Harrison, Kipilii, and the [Petitioner]. On March 25, 1997, two fishermen discovered Fortè's "badly decomposed" body in the water approximately forty (40) miles from the location where Fortè had originally been left. There was duct tape around the mouth and head of Fortè's body, and the arms and legs were taped in a "hog-tie" fashion.

Dr. Emily Ward, a forensic pathologist working as a medical examiner for Davidson County, reviewed the autopsy records and photographs in this case. Dr. Ward opined that Fortè died as a result of "homicidal violence." She related that the manner in which Fortè was bound with his arms and legs pulled behind him could have restricted his airflow sufficiently to ultimately result in death. Additionally, the tape over his mouth would have completely occluded his airway. Because of the extensive decomposition of the body, she could not conclusively determine if Fortè had died as the result of strangulation, beating, or drowning. However, Dr. Ward vehemently maintained that Fortè's death resulted from homicidal violence.

State v. Christopher D. Neighbours, No. M2000-02594-CCA-R3-CD, 2002 WL 489223, at *1-3 (Tenn. Crim. App. Mar. 28, 2002) (footnotes omitted), perm. app. denied (Tenn. Oct. 7, 2002). This court affirmed the Petitioner's conviction on direct appeal. Id. at *1.

On October 7, 2003, the Petitioner filed a timely petition for post-conviction relief. Following the appointment of counsel, the Petitioner filed an amended petition in September 2012 and a second amended petition in November 2014.[2] At a hearing on the petition, Lila Statom testified that she served as the lead prosecutor in the Petitioner's case during her tenure with the Davidson County District Attorney's Office, where she worked from 1989 to 1998. Ms. Statom recalled that, over the years, she occasionally used the testimony of cooperating witnesses or co-defendants at trial. She testified that, when calling such witnesses, she "wanted them to tell the truth" and that she would not call them if she thought they would be dishonest. She stated, "I think as a prosecutor you do not want to hide anything from the jury. You want to be upfront with the jurors and so

---

[2] It is unclear from the record why the Petitioner's case languished in the trial court for almost nine years before an amended petition was filed.

most all of the time we would bring out any shortcomings that the witness might have like felony convictions and the like." Ms. Statom agreed that cooperating co-defendants have an interest in helping themselves.

Ms. Statom testified that the cooperating co-defendant in the Petitioner's case, Jeffrey Downs, entered a guilty plea after testifying at the Petitioner's trial. Ms. Statom explained that she would request that a trial court sever co-defendants for "any number of reasons" but that, in the Petitioner's case, she made a "tactical decision" to try the Petitioner's case first. Ms. Statom agreed that Mr. Downs testified at the Petitioner's trial without a plea agreement from the State and implicated himself in the victim's murder. She stated:

> But [Mr. Downs's] attorney was hoping . . . that we would give [Mr. Downs] some consideration, because it was clear that each of these individuals were guilty and I believe he was hoping that we would give some consideration.

However, she testified that neither she nor the co-prosecutor on the case gave any indication that Mr. Downs would receive anything in exchange for his testimony. She explained, "I am sure [Mr. Downs] was hoping to convince us . . . that he deserved some consideration for [his testimony][,]" but she had "no idea what [Mr. Downs's] hope was based on." She recalled that Mr. Downs was told, "We will make no promises to you, we will just have to wait and see."

In regards to a statement she made to the jury during closing argument, Ms. Statom testified that the purpose of the statement was to summarize the evidence. Ms. Statom testified that Mr. Downs told the truth "based on the facts of the case and the other evidence in the case. His testimony was truthful." When asked if she vouched for the credibility of Mr. Downs, Ms. Statom responded that she "argue[d] the facts." Although she could not recall with certainty, Ms. Statom believed that she was no longer working in the Davidson County District Attorney's Office by the time of Mr. Downs's guilty plea to facilitation to commit felony murder and especially aggravated kidnapping. She recalled that Mr. Downs received concurrent sentences of fifteen years for especially aggravated kidnapping and twenty-five years for facilitation to commit felony murder. Ms. Statom also remembered that the Petitioner's trial counsel argued to the jury that Mr. Downs would receive a plea deal from the State. She agreed that Mr. Downs's likely purpose in testifying was his "hope to get a reduced sentence[.]" However, she stated that there was no implicit agreement between Mr. Downs and the State and that during closing argument she was "arguing from the facts that had been testified to [on] the witness stand."

Assistant District Attorney General Roger Moore, the co-prosecutor in the Petitioner's case, testified that he had worked at the Davidson County District Attorney's Office since 1990. Mr. Moore stated that he currently served as the team leader in Criminal Court Division V where he supervised three other prosecutors. He said that, as team leader, he occasionally approves plea agreements, and he confirmed that plea agreements on murder charges were discussed "all the way up" to the district attorney general. He agreed that, at times, co-defendants are severed so that one can testify against the other. Mr. Moore recalled that only once has he allowed a cooperating co-defendant to plead guilty prior to testifying. He explained that if a cooperating co-defendant pled guilty before testifying, there would be no recourse for the State if the co-defendant decided not to cooperate after entering a plea. Mr. Moore stated that, when a cooperating co-defendant agrees to testify against a defendant, the cooperating co-defendant is "hoping for" consideration in exchange for truthful testimony but realizes "that it will be [the prosecutor's] decision . . . as to what that consideration will be."

Trial counsel testified that he had practiced law for thirty-four years and that the emphasis of his work had been on criminal defense. He stated that he was retained to represent the Petitioner and that the case proceeded to trial in 1997. Regarding the facts of the case, trial counsel explained:

> [T]his was basically a situation involving several players, some were charged, some were not, basically it was a marijuana transaction that ended up unsatisfactorily to some of the individuals, three pounds of marijuana as I recall was involved, one defendant from I believe out of town in essence seemed to have ripped off the other individuals that were at the home of Mr. Downs.
>
> The testimony indicated that at some point in time [the Petitioner] arrived in the apartment complex with his girlfriend who is a sister of an individual, Mr. Terry Garvin, who later commits suicide.
>
> The testimony indicated that when [the Petitioner] arrived that things escalated as far as some acts of violence. [The Petitioner] had a weapon that Mr. Downs I believe picked up a golf club and beat the victim and then ultimately the victim in the case was placed into a car and ended up in Mill Creek off of Nolensville Road where he was found several weeks later deceased.

He agreed that there was no physical evidence that the Petitioner participated in the murder but that the State's theory was that the Petitioner was the "mastermind" "in charge of the whole operation."

According to trial counsel, Mr. Downs's testimony was the "lynchpin" of the State's case against the Petitioner. Trial counsel testified that his attack on Mr. Downs's credibility was the most significant part of the trial. Trial counsel cross-examined Mr. Downs as vigorously as he could. He specifically asked Mr. Downs about whether there was a plea offer prior to his testimony and asked Mr. Downs about his motivation for testifying. Trial counsel recalled that he tailored his cross-examination to show that Mr. Downs had a reason to testify as he did—to get leniency from the State.

Trial counsel testified that it was clear before trial that Mr. Downs would testify against the Petitioner. Trial counsel received no information from the State regarding a plea offer to Mr. Downs, which was not unusual. Trial counsel recalled that Mr. Downs eventually received a fifteen-year sentence, despite facing a potential sentence of life without parole. He said that he conveyed to the jury that "Mr. Downs surely must have had an expectation of receiving favorable treatment," even though Mr. Downs denied it from the witness stand.

Trial counsel recalled that Mr. Moore said during closing argument that Mr. Downs could be facing a sentence of life without parole. He did not believe that Mr. Moore would deliberately make a false statement to the jury. He explained that an attorney could advise a client to testify without a plea deal in place and that such advice would be based on the attorney's experience with and opinion of the prosecutor.

On cross-examination, trial counsel testified that the jury in the Petitioner's case was instructed regarding the credibility of witnesses. Additionally, the court instructed the jury on accomplice testimony and the need for corroboration, and trial counsel argued to the jury that Mr. Downs's testimony was not sufficiently corroborated.

Appellate counsel testified that he had practiced law for twenty-six years and that half of his practice was devoted to criminal cases, including criminal appeals. Appellate counsel explained that, at trial, he represented the Petitioner's co-defendant, Jeffrey Downs, but that Mr. Downs's case was eventually settled. Several years later, the Petitioner's family contacted appellate counsel and hired him to work on the Petitioner's direct appeal. Appellate counsel testified that he checked with the Board of Professional Responsibility to ensure that he could ethically represent the Petitioner. He further testified that the Petitioner waived any conflict in his representation.

Appellate counsel recalled that Mr. Downs had been charged with first degree murder and faced a sentence of life without parole. Regarding a potential plea deal between the State and Mr. Downs, appellate counsel testified that there "wasn't a deal" and that "there [were] no promises" made to Mr. Downs by the State. Appellate counsel

recalled that Ms. Statom and Mr. Moore indicated that they would consider Mr. Downs's request for a plea deal after the Petitioner's trial. Appellate counsel explained that because he had previously worked with Ms. Statom and Mr. Moore he "hoped" Mr. Downs would get a deal. However, appellate counsel could not specifically recall any conversations he had with Mr. Downs that led to Mr. Downs's testifying at the Petitioner's trial.

Appellate counsel testified that there were no promises from the State as to a plea offer, but appellate counsel might have had indications that there could be a deal if Mr. Downs testified. Otherwise, appellate counsel would not have allowed Mr. Downs to make incriminating statements at the Petitioner's trial. Appellate counsel explained that he wanted to get a plea deal in writing before Mr. Downs's testimony, but the State would not do so. Appellate counsel testified that the State "had a very strong case" against the defendants and that several defendants, including Mr. Downs, had already made statements to police. Appellate counsel stated that he had expected that Mr. Downs would receive a plea deal, and counsel presumed that Mr. Downs also expected a deal.

Appellate counsel recalled that he raised the issue of the sufficiency of the evidence on direct appeal in the Petitioner's case, but he did not raise any argument regarding the Petitioner's sentence. He explained that he "had a legitimate shot at the sufficiency [issue], and if I went into the sentencing the only thing in my professional opinion it would have done was eliminated any real shot I had at the sufficiency." Appellate counsel stated that he wanted to divert the appellate court's attention from the sentencing hearing testimony which was damaging to the Petitioner and for the appellate court to focus solely on the sufficiency argument that "you cannot kidnap a dead man." He stated that counsel on appeal must:

> [W]ean out the stuff to keep the Court on focus as to what you really want them to look at and in this case I had to make a choice and my professional opinion was I had a shot at the sufficiency. I didn't think in looking back on it I still don't think that I could have overcome the consecutive sentencing issue.

On cross-examination, appellate counsel agreed that Mr. Downs gave a taped and recorded statement to the police, and he stated that he went over that recorded statement with Mr. Downs before Mr. Downs made the decision to testify against the Petitioner.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and subsequently entered a written order denying relief. This timely appeal followed.

## II. Analysis

### Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579); see also Kendrick, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. Kendrick, 454 S.W.3d at 457.

### Due Process

The Petitioner first asserts that the State violated his constitutional right to due process by failing to disclose what he claims was "an implicit agreement" between the State and Mr. Downs. He argues that due process required the State to disclose prior to trial "any potential plea deal" for Mr. Downs's testimony so that such information could be used to impeach Mr. Downs. The Petitioner also contends that his right to due process was violated when the prosecutor failed to correct "false testimony" from Mr. Downs concerning the lack of a deal with the State. The State responds that the Petitioner failed to establish that any agreement existed between the State and Mr. Downs. Moreover, the State argues that trial counsel was aware of Mr. Downs's intention to testify, trial counsel cross-examined Mr. Downs to expose his bias, and trial counsel specifically addressed Mr. Downs's hope for consideration for his testimony during that cross-examination.

In Brady v. Maryland, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In order to establish a Brady violation, four prerequisites must be met:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). "The prosecution is not required to disclose information that the accused already possesses or is able to obtain . . . or information which is not possessed by or under the control of the prosecution or another governmental agency." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (citing State v. Caldwell, 656 S.W.2d 864, 897 (Tenn. Crim. App. 1983) and Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977)). The defendant must prove by a preponderance of the evidence that a Brady violation has occurred. Edgin, 902 S.W.2d at 389.

In order to establish a Brady violation, the evidence need not be admissible; it only needs to be favorable to the defendant. State v. Spurlock, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993). Favorable evidence includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensible, element of the prosecution's version of events, or challenges the credibility of a key prosecution witness." Johnson v. State, 38 S.W.3d 52, 56-57 (Tenn. 2001) (internal quotation marks omitted). Evidence is material under Brady "only if there is a reasonably probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985) (citing Strickland v. Washington, 466 U.S. 668, 694 (1984)). A "reasonable probability" is "a probability sufficient to undermine the confidence in the outcome." Id. (internal quotation marks omitted).

It is well-established law that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." Napue v. Illinois, 360 U.S. 264, 269 (1959). As such, the State may not knowingly present false testimony, and it has an affirmative duty to correct the false testimony of its witnesses. State v. Giglio, 405 U.S. 150, 153-54 (1972). In order to be granted a new trial based on the presentation of false testimony, the defendant must establish that "the State presented false testimony; the State knew the testimony was false, and the testimony was material." State v. Cureton, 38 S.W.3d 64, 74-75 (Tenn. Crim. App. 2000). If testimony is determined to be false, this court must determine

whether the false testimony could have affected the jury's judgment. <u>Giglio</u>, 405 U.S. at 154 (citing <u>Napue</u>, 360 U.S. at 271).

In rejecting this claim, the post-conviction court accredited the testimony of Ms. Statom and appellate counsel and found there was no agreement, whether formal or implied, between the State and Mr. Downs in advance of Mr. Downs's testimony. The court found that Mr. Downs was "simply following the advice of his attorney, who hoped to be offered a deal after [Mr.] Downs testified (without any actual indication or promise of a deal)." The court acknowledged that appellate counsel said that he might have had an indication that there could be an offer if Mr. Downs testified but found that appellate counsel was unsure on this point. The post-conviction court found that trial counsel cross-examined Mr. Downs on the issue of his hope for leniency in exchange for his testimony and that Mr. Downs's motivation for testifying was before the jury. As such, the post-conviction court determined that trial counsel mitigated any prejudice the Petitioner might have faced by being unable to cross-examine Mr. Downs on specific details of any deal.

Finally, the post-conviction court found that, even if there was an implicit agreement between the State and Mr. Downs, the Petitioner failed to establish that the information was material under <u>Brady</u>. The post-conviction court found that:

> [T]he Petitioner has not shown that a reasonable probability exists that the outcome of the proceedings would have been different had the evidence of a plea agreement or expectations for lenienc[y] in anticipation of an agreement been exposed. The Court finds that there was other evidence for the jury to have convicted the Petitioner of felony murder—particularly the testimony of Ronnie McAllister, who was not a co-defendant—and that also corroborated [Mr.] Down[s]'s testimony.

On appeal, the Petitioner disputes the post-conviction court's finding that no agreement existed between the State and Mr. Downs and argues that "the protestation by the State and [appellate counsel] that no deal had been reached belie[s] credulity." However, the post-conviction court resolved all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence, <u>Fields</u>, 40 S.W.3d at 456, and this court is bound by the post-conviction court's factual findings unless the evidence preponderates against them, <u>Kendrick</u>, 454 S.W.3d at 457. In this case, the record does not preponderate against the post-conviction court's findings. Both Ms. Statom and appellate counsel testified that there was no plea deal between the State and Mr. Downs in advance of Mr. Downs's testimony at the Petitioner's trial. Ms. Statom testified that, although appellate counsel may have been hoping that Mr. Downs would receive some consideration for his testimony, neither she

nor Mr. Moore gave any indication that Mr. Downs would receive anything in exchange for his testimony. Appellate counsel recalled that Ms. Statom and Mr. Moore indicated that they would consider Mr. Downs's request for a plea deal after the Petitioner's trial, and appellate counsel explained that because he had previously worked with Ms. Statom and Mr. Moore he "hoped" Mr. Downs would get a deal. However, appellate counsel testified that there "wasn't a deal" and that "there [were] no promises" made to Mr. Downs by the State.

Because there was no plea deal—implicit or otherwise—between the State and Mr. Downs in advance of Mr. Downs's testifying at the Petitioner's trial, the Petitioner has failed to establish that his due process rights were violated based on the State's failure to disclose a plea deal or the prosecutors' failure to correct allegedly false testimony from Mr. Downs that he had no plea deal. The Petitioner is not entitled to relief on this basis.

*Ineffective Assistance of Trial Counsel*

The Petitioner next contends that he was denied the effective assistance of counsel based on trial counsel's failure to object when the prosecutor allegedly vouched for the credibility of Mr. Downs during closing argument. He contends that trial counsel's "central theme of defense" was attacking the credibility of Mr. Downs, and as such, there was no "valid tactical reason" for failing to object to the improper argument. The Petitioner argues that the prosecutor's comments were also intentionally misleading because "the evidence showed that there had to have been at least an implicit deal or reason Mr. Downs expected a deal in return for his testimony." The State responds that the Petitioner failed to establish that trial counsel's failure to object was not a tactical decision or that the prosecutor's comments were improper.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting

effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

This court has recognized five general areas of prosecutorial misconduct in closing argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or as to the defendant's guilt; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting broader issues other than guilt or innocence of the defendant; and (5) arguing or referring to facts outside the record unless such facts are matter of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). Improper argument constitutes reversible error if "the conduct was so improper or the argument so inflammatory that it affected the verdict to the [defendant's] detriment." Goltz, 111 S.W.3d at 5. To determine the prejudicial impact of any misconduct, this court should consider: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The record on appeal does not include a transcript of closing arguments from the Petitioner's trial. However, it appears from the post-conviction court's order that, in

rebuttal argument, the prosecutor said that Mr. Downs "told the truth." The prosecutor also said that Mr. Downs "may not" get some consideration for his testimony and that "there is no deal[.]" In denying relief on this issue, the post-conviction court found that the Petitioner failed to present any evidence to suggest that trial counsel's failure to object to these statements was "anything but a tactical decision," noting that trial counsel was asked no questions on the issue at the post-conviction hearing. The post-conviction court additionally concluded that, even if it assumed deficient performance, the Petitioner failed to show that trial counsel's failure to object "affected the verdict."

This court has previously recognized that "[t]he decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." Derek T. Payne v. State, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010), perm. app. denied (Tenn. May 11, 2010); see also Lemar Brooks v. State, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *14 (Tenn. Crim. App. Jan. 11, 2012), perm. app. denied (Tenn. May 16, 2012). Trial counsel "often choose not to object to damaging evidence for strategic reasons, such as to avoid emphasizing [the unfavorable evidence] to the jury." Derek T. Payne, 2010 WL 161493, at *15 (internal quotation marks omitted) (alterations in original). As a result, "testimony from trial counsel as to why he or she did not object to the allegedly prejudicial remarks is essential to determine whether trial counsel was ineffective." Lamar Brooks, 2012 WL 112554, at *14. Absent testimony from trial counsel or evidence indicating that counsel's decision was not tactical, "we cannot determine that trial counsel provided anything other than effective assistance of counsel." State v. Leroy Sexton, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan. 12, 2007), perm. app. denied (Tenn. May 14, 2007).

A review of the post-conviction hearing transcript shows that trial counsel was not asked about his failure to object to the prosecutor's allegedly improper comments. Because trial counsel was not asked about his failure to object, we are unable to assess whether counsel's lack of an objection was a matter of trial strategy. As previously discussed, the post-conviction court found that there was no plea agreement between the State and Mr. Downs prior to Mr. Downs's testimony, and when asked about her statements in closing argument, Ms. Statom testified that she was summarizing the evidence from trial, not vouching for Mr. Downs's credibility. Without the transcript of closing arguments, we are unable to consider the context of the prosecutor's comments within the overall argument and determine if "the conduct was so improper or the argument so inflammatory that it affected the verdict to the [defendant's] detriment." Goltz, 111 S.W.3d at 5. Thus, even if trial counsel were deficient in failing to object to the prosecutor's statements, the Petitioner has not established that any such deficiency resulted in prejudice.

*Ineffective Assistance of Appellate Counsel*

The Petitioner asserts that he received ineffective assistance of appellate counsel based on counsel's failure to challenge the imposition of consecutive sentencing on direct appeal. A defendant has a right to effective representation both at trial and on direct appeal. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995) (citing Evitts v. Lucey, 469 U.S. 387 (1985)). The test for ineffective assistance of counsel is the same for both trial and appellate counsel, under the Strickland standard set forth above. Id. That is, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." Id. at 597; see also Carpenter, 126 S.W.3d at 886-88.

Regarding claims of ineffective assistance by appellate counsel, our supreme court has provided:

> Appellate counsel are not constitutionally required to raise every conceivable issue on appeal. Indeed, experienced advocates have long emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues.
>
> The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion. Therefore, appellate counsel's professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference.

Carpenter, 126 S.W.3d at 887 (internal quotation marks and citations omitted).

When a petitioner alleges that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of that issue. Id. "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." Id. Further, when an omitted issue is without merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim. Id. at 887-88.

The post-conviction court found that the Petitioner failed to establish ineffective assistance of appellate counsel because the Petitioner offered no evidence that appellate counsel's decision to forego challenging the trial court's imposition of consecutive sentences was not a strategic decision. The court noted that the Petitioner failed to introduce a transcript of the sentencing hearing and found that "neither the exhibits

offered at the hearing, nor the testimony of [appellate counsel] or any other witness, are sufficient to prove . . . that the issue would have any merit."

In this case, it is clear from the testimony at the post-conviction hearing that appellate counsel's decision not to raise the issue of consecutive sentencing on direct appeal was a strategic one. Appellate counsel testified that he believed he had "a legitimate shot" at the sufficiency issue and that he did not challenge the imposition of consecutive sentences because he wanted to divert the appellate court's attention from the sentencing hearing testimony, which was damaging to the Petitioner. Appellate counsel stated that he had intended for the appellate court to focus solely on the sufficiency argument and that, in his professional opinion, the issue of consecutive sentencing had no merit. Appellate counsel's professional judgment is entitled to considerable deference with regard to which issues best served the Petitioner on appeal. Carpenter, 126 S.W.3d at 887. Moreover, as recognized by the post-conviction court, the Petitioner offered no proof that the issue of consecutive sentencing had any merit. Accordingly, the Petitioner has failed to establish either deficient performance or prejudice from appellate counsel's failure to raise the issue on direct appeal.

Finally, the Petitioner contends for the first time on appeal that appellate counsel had an actual conflict of interest at the time of his representation of the Petitioner. However, the Petitioner did not raise the issue in his petition for post-conviction relief, and consequently, it was not addressed by the post-conviction court. This court will not address claims raised for the first time on appeal. See State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). The Petitioner is not entitled to relief.

## III. Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed.


_____
ROBERT L. HOLLOWAY, JR., JUDGE