
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2017

**STATE OF TENNESSEE v. JOHNATHAN ROBERT LEONARD**

**Appeal from the Circuit Court for Marshall County**
**No. 15-CR-110      Franklin L. Russell, Judge**

_____

**No. M2016-00269-CCA-R3-CD**

_____

Johnathan Robert Leonard ("the Defendant") appeals his Marshall County convictions for three counts of rape of a child, two counts of soliciting sexual exploitation of a child, and one count of aggravated sexual battery, for which he received an effective sentence of ninety-six years. The Defendant asserts that he was denied due process and a fair trial based on numerous instances of prosecutorial misconduct and that the cumulative effect of "irregularities" during voir dire and jury selection resulted in structural constitutional error, necessitating a new trial. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Brent Horst, Nashville, Tennessee, for the appellant, Johnathan Robert Leonard.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn Funk, District Attorney General; and Weakley E. Barnard and Drew Wright, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**[1]

*Trial*

This case arose after the Defendant's girlfriend's two daughters, nine-year-old A.W.[2] and seven-year-old B.W., came forward with allegations of sexual abuse by the Defendant. From August 2013 to March 2014, the victims' mother lived with the Defendant and her children in an apartment in Lewisburg. During this timeframe, the victims' mother worked full-time while the Defendant worked only sporadically. Therefore, the Defendant was at home and cared for A.W. and B.W. when they got off the school bus in the afternoons and on weekends when the victims' mother was at work. On March 2, 2014, B.W. and A.W. disclosed to their mother the Defendant's sexual abuse. The following day, the victims' mother took her children from the apartment and contacted the Lewisburg Police Department. After being interviewed by detectives, B.W. and A.W. were taken to Our Kids Clinic for forensic examinations. The Defendant was later arrested based on the disclosures made by the victims. After waiving his *Miranda* rights, the Defendant spoke to detectives and denied having any type of sexual contact with the girls.

At trial, B.W. testified that, while her mother was at work, the Defendant would "make [her] touch his penis." She explained that the Defendant would "pull his pants down" and tell her what to do with his penis. She further stated that this happened multiple times and in different rooms of the apartment. B.W. testified that the Defendant put his penis in her mouth and touched her with his penis on her "bottom" and vagina. She stated that the Defendant put his penis "in [her] bottom" and that sometimes he would put baby oil on his penis. She explained that "[i]t would hurt" when the Defendant's penis touched her bottom. B.W. stated that she saw "white stuff" come out of the Defendant's penis and that sometimes it went into her mouth. B.W. also recalled that she would watch movies with the Defendant through his Xbox. The movies were pornographic movies, in which people had "no clothes on" and were "playing with each other's privates."

A.W. testified that the Defendant "[s]how[ed] his private parts" to her while he was on the couch in the living room. She stated that the Defendant made her touch his

---

[1] The Defendant has not challenged the sufficiency of the evidence or the sentence imposed by the trial court on appeal. Therefore, we have limited the recitation of facts to those necessary for a basic understanding of the offenses for which the Defendant was convicted and of what transpired at trial.

[2] It is the policy of this court to refer to minor victims by their initials only. We intend no disrespect.

penis with her hand, and he made her move her hand "up and down." A.W. testified that this happened more than one time. She recalled another time when the Defendant told her to pull down her underwear, and he touched her "butt" with his penis. A.W. stated that the Defendant pushed his penis "[i]n [her] butt" and that it hurt when he did this. She recalled that the Defendant would put lotion on her hand and make her rub the lotion on his penis. She stated that the Defendant's penis "would go straight" and that "clear, white stuff would come out." A.W. explained that one time she saw the Defendant put his penis in B.W.'s mouth. She also recalled that the Defendant would show her pornographic movies on his Xbox. She specifically recalled that the Defendant watched movies on the website "Pornhub."

The Defendant testified and denied the allegations of sexual abuse. He also denied making B.W. and A.W. watch pornographic movies with him. The Defendant stated that, on the morning that B.W. and A.W. made the disclosures, he and the victims' mother had argued, and he told the victims' mother he was leaving her. Moreover, the Defendant contended that, after the Defendant said he was leaving the victims' mother on a previous occasion, she had threatened to "put him in jail." The Defendant testified that B.W. had been exposed to inappropriate movies at her friend's house.

In closing argument, defense counsel argued the Defendant's theory of the case, in part, as follows:

> [General] Barnard talked about common sense, and there's no way these children could have come up with this detailed version that they gave here in court the other day, between the time—from the time Mom has taken them to the police department and in that short span of time. I agree with that 100 percent. That's not what happened.
>
> Mom takes them down to the police department. They make some—and they talk about it in the car—they make some type of statement to the police. And we didn't hear the details of that. I'm not saying we should have. There are rules how these things go.
>
> But not long after that police department interview, we know what the children said.
>
> Bear with me, I'm going to read the entire paragraph of what each of the girls said at the hospital, so I don't have to read it again.

So, what [A.W.] said.  [A.W.] indicated that she was afraid to talk about what happened on Sunday because she did not want her mom to cry anymore.  She did not want anybody to cry anymore.

[A.W.] then indicated that someone named Johnathan had done something to her on Sunday.  And as to what he had done, [A.W.] again expressed reluctance and fear related to talking about what had happened.

[A.W.] agreed to answer a few specific questions necessary for diagnosis and treatment today.  During this type of questioning, [A.W.] reported digital rectal touching by Johnathan had occurred on Sunday.

[A.W.] said it was almost always on my butt.  He did stuff.  [A.W.] provided no additional details, and no further questioning was pursued.

And this is what [B.W.] said.

When asked about the reason for her visit to the clinic today, [B.W.] said, "I don't really want to say."

When asked why she did not want to say, [B.W.] stated, "Because my dad got took [sic] away.  My dad, he did the same thing that Johnathan did to us, my dad got taken away.  Only he did it to another kid.  So now he can't be around little kids anymore, only teenagers.  And he cannot come to our house no more [sic].  And Johnathan can't come to our house no more [sic]."

[B.W.] then stated, "Like I told yesterday when I stated what—told yesterday," [B.W.] said, "It was really scary.  Yesterday was really scary." [B.W.] then reports she was scared yesterday and continued to feel afraid that her mother is going to be taken away from her.

[B.W.] stated, "And I don't want my mom to be taken away, because then everybody would be taken away.  And we're going to have to find another family who will be nice to us, and not like my dad or Johnathan."

[B.W.] then indicated that she preferred not to answer today, regarding what Johnathan did.

. . . .  [T]his is a medical exam, this is not court testimony.  This is not telling you every single thing that happened to the girls.  The bottom

- 4 -

line is there was no detailed statement. There was no, "Well, I touched his erect penis and it looked like this." . . . . It wasn't that detailed two days after the allegation.

It simply wasn't, not as [Genera] Barnard seems to have thought.

A year and a half after the allegation, we get these types of sordid details.

….

It took a year and a half before we're in court and we hear those details.

What happened in that year and a half?

….

[L]et's not forget, where have those girls spent the last 600 nights? With their mother. Who I think at this point is fair to say hates [the Defendant], who she threatened to leave numerous times—or when he threatened to leave numerous times, said, "Do it, I'll have you arrested," and actually had him arrested.

So those details don't come out until they have lived with this mother . . . .

….

So these children who have lived their entire lives with [the victims' mother] and spent—since the allegation the last 600 nights, not just the night before trial, not just one night, but the last 600 nights in the presence, care and control of this woman who hates the [D]efendant.

Following deliberations, the jury found the Defendant guilty of three counts of rape of a child, two counts of solicitation of sexual exploitation of a minor, and one count of aggravated sexual battery. The trial court sentenced the Defendant, as a Range II multiple offender, to consecutive terms of thirty-two years at one hundred percent on each count of rape of a child. The trial court sentenced the Defendant, as a Range I standard offender, to concurrent terms of ten years at one hundred percent for aggravated sexual battery and five years at thirty percent on both counts of solicitation of sexual

exploitation of a minor and ordered these sentences to run concurrently with the Defendant's sentences for rape of a child, for a total effective sentence of ninety-six years at one hundred percent in the Department of Correction.

*Motion for New Trial*

Thereafter, the Defendant filed a timely motion for new trial and amended motion for new trial. At a hearing on the motion, one juror ("Juror Leonard") testified that he formerly worked as a 911 dispatcher but was currently employed with the Marshall County Sheriff's Office as a correctional officer. Juror Leonard stated that he began his employment with the sheriff's office on October 26, 2015. Juror Leonard could not recall if he applied for the position before or after the Defendant's trial. The following exchange took place during the Defendant's questioning of Juror Leonard:

> Q. . . . Do you recall whether you, at the time of this trial, do you recall making any unofficial inquiries about that position, to the sheriff or anyone in his department before the trial?
>
> A. What was the trial date again?
>
> Q. August 3rd.
>
> A. I don't think so.

Following the hearing, the trial court found that the jury panel called for the Defendant's case had heard one other rape case prior to the instant trial. The trial court found that one juror, Juror Derryberry, served on both juries. The trial court noted that the Defendant retained an investigator to interview the jurors after the trial but that the jurors "advised the investigator that the juror who sat on both trials did not impart during deliberations in the second case any information whatsoever from the first case[.]"[3] The court also determined that neither the trial court nor the prosecutors improperly rehabilitated any prospective juror during voir dire. Finally, the trial court found that, during voir dire, Juror Leonard did not misrepresent anything about his then existing employment or his prospective relationship with the Marshall County Sheriff's Office. The trial court determined that Juror Leonard did not become employed by the sheriff's office until two months after the Defendant's trial. The trial court entered a written order denying the motion for new trial. This timely appeal follows.

---

[3] During the hearing, defense counsel explained that following the jury's verdict the Defendant hired an investigator to interview jurors. Defense counsel stated, "[W]e developed no information that [Juror Derryberry] shared any inappropriate information. There were jurors willing to talk. Some didn't want to. But we developed no information that inappropriate, extraneous information was shared."

- 6 -

## II. Analysis

### A. Prosecutorial Misconduct

The Defendant first contends that he was denied due process and a fair trial based on a persistent pattern of prosecutorial misconduct, consisting of "numerous prejudicial and inflammatory comments[.]" The State responds that the Defendant waived the majority of his claims of prosecutorial misconduct by failing to object at trial and failing to include the claims in his motion for new trial and that he is not entitled to relief under plain error. As for the Defendant's preserved claim of prosecutorial misconduct, the State responds that the issue is without merit.

In total, the Defendant argues on appeal that sixteen different comments by prosecutors at trial were improper. The challenged comments are as follows: [4]

1. [W]e're going to start this trial, and *we're going to have two little girls come in here and do the hardest thing they've ever done in their life*, I want to make sure that you know before we have to do that that you can be a fair and impartial jury. So take five seconds to look in your hearts, and if you can't, if you can't and you're not sure that you can be, raise up your hand if you can't be fair in this case today. (during voir dire)

2. *Now, how much bravery will it take, she's now eight, to come in here and tell you the things that happened to her as a six and seven year old girl, a little innocent girl* telling you about the horrible things that happened to her by her mom's boyfriend, a man she one time called dad? (during opening statement)

3. *These two little girls are probably going to feel like they're the ones on trial.*[5] (during opening statement)

4. *You knew before you walked in this courtroom today that he gave--*[6] (during cross-examination of a defense witness)

---

[4] For each claim, we have included the prosecutor's surrounding comments for context but have italicized the specific portion of the remarks that the Defendant asserts constitutes prosecutorial misconduct. We have also noted at what point in the trial the prosecutor made the comment.

[5] During trial, the Defendant objected to comments 3-5 and 16. The trial court overruled the Defendant's objection to comment 3 but sustained the objections to comments 4, 5, and 16.

[6] This comment was cut off by an objection from defense counsel.

5.  *You're being evasive.*  (during cross-examination of the Defendant)

6.  And from the opportunity that I've had sitting down there, *I've told others on this panel that I always try to watch the jurors, see what they're doing.  And every time I've looked over at y'all, I've been totally satisfied with the attention that you've given this case.*  (during closing argument)

7.  *We spent a lot of time yesterday, some time the day before, attempting to try a case against [the victims' mother].*  I don't know, and for the purposes of this trial, I don't care about [the victims' mother].  I don't care whether she is a good mother or a bad mother, for purposes of this trial.  *[The victims' mother] is not on trial.*

….

*Now, there is an old adage that goes around the courthouses of Tennessee.  An adage goes something like this:  If you are a defendant, and you look at the situation and the facts are against you, then you try to distract the jury away from the facts.  So talk about the law.  If you're a defendant, and the law is against you, then talk about the facts.  If you are a defendant and the facts and the law are against you, then you talk about anything else, but get the jury looking the other way.*  Don't be distracted.  Look at the facts and look at the law in this case. (during closing argument)

8.  *And then in the afternoon, she goes to get the children and brings them in to the police department.*  And counsel asked, "Well" -- well asked the children, "Did your mother talk to you in the car?"  "Well, yeah."  Well, we know generally where the relative lived is between the courthouse and [the apartment complex], just a few minutes drive.  *Common sense, a 6 and 7 year old child, children, being educated that way over that short period of time, enough to say that, "His penis, when I saw it, was curvy."*  We all know what she meant.  *And then it was straight.*  We all know what she meant.  *And "White stuff came out of the end of it."*  We all know what she meant.  *"And he put it in my mouth.  He put my hand on it."* (during closing argument)

9.  [S]*ometimes in a case like this, my job is to help children.* (during closing argument)

- 8 -

10.  But there [were] *two things, that even somebody as hard-nosed as I am, that happened in the trial that bothered me, [c]an't help it.  When [B.W.] said, "[I]t went in my mouth," that tore me up.  That tore me up.*

….

*One of the other things that tore me up in this trial is two simple words, "It hurt."*  When they were talking about penetration, "It hurt."  (during closing argument)

11.  *I told you there were two things that really bothered me.*  It wasn't with B.W., the second thing.  It was with A.W.  *And I am going to admit something to you.  This was done in the courtroom because I grabbed [General Wright] and told him—and I didn't know what the child would do, have her demonstrate.  It tore me up.  It was my fault.*  But you folks needed to see.  (during closing argument)

12.  *And again, how much time did they have?*  General Barnard focused on this.  Did they have enough time to come up with grand scheme or grand story in a short drive, from somewhere in Lewisburg to the Lewisburg Police Department?  (during rebuttal closing argument)

13.  *But he's wanting it to go both ways.  He's wanting to use a double-edged sword there, because he actually attacked [A.W.] about some testimony from her in court on May 23rd 2014.  So, you know, but they don't tell about any of these details until a year and a half later when he wants to use her previous testimony against her when it's convenient.*  (during rebuttal closing argument)

14.  [Defense counsel] said the words, "I'm not suggesting therapists or prosecutors were persuading the kids."  Okay.  If you're not doing that, why mention it about five to ten times?  I think he did it, maybe it's an insinuation.  Maybe that's the way he would like to characterize it.  He did it to the girls when they were on the stand.  "Oh, did you get the toys from [General Wright]?  Did you get the toys from [General Wright], when you talked to him about it?  Did [General Wright] tell you what to say, did Mom tell you what to say?"  *He's not going to say that the prosecutor's trying to persuade them.*  Maybe it's an insinuation, maybe I'm over-thinking it.

….

*And I did, I did take offense to this.* I think I'm going to have to elaborate a little bit. He said he called a cast of characters. (during rebuttal closing argument)

15. *[B.W.] and the bear. I don't know what to say. I don't know what to say about that. If the case crumbles because of that, then y'all put more stock in it then I would think necessary.* But that's just for y'all to decide. I think you can use your common sense here. (during rebuttal closing argument)

16. *Alicia Lipscomb.[7] I've run into Alicia before* -- (during closing argument)

The record reveals, however, that the Defendant raised contemporaneous objections to only four of the statements about which he now complains—comments 3-5 and 16. We agree with the State that the Defendant's failure to raise a contemporaneous objection to the remaining twelve comments waives plenary review of the claims on appeal. *See* Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); *State v. Little,* 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (holding that the defendant's failure to object to the prosecutor's alleged misconduct during closing argument waived the issue). Additionally, as noted by the State, the Defendant alleged in his motion for new trial that only one of the objected-to comments—comment 16—amounted to prosecutorial misconduct. By failing to include any of the other fifteen comments in his motion for new trial or amended motion for new trial, the Defendant failed to properly preserve these claims, and he is not entitled to relief on appeal unless the prosecutors' remarks constitute plain error. *See* Tenn. R. App. P. Rule 3(e) (stating that "no issue presented for review shall be predicated upon . . . action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial"). We will first conduct a plenary review of the Defendant's claim of prosecutorial misconduct based on comment 16 and then review the prosecutors' remaining comments for plain error.

## *1. Plenary Review*

The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). That said,

---

[7] Alicia Lipscomb testified for the Defendant at trial.

Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008).

In *State v. Goltz*, 111 S.W.3d 1 (Tenn. Crim. App. 2003), this court listed "five general areas of prosecutorial misconduct" that can arise during closing argument:

> (1) intentionally misleading or misstating the evidence;
>
> (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;
>
> (3) making statements calculated to inflame the passions or prejudices of the jury;
>
> (4) injecting broader issues than the guilt or innocence of the accused; and
>
> (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

*Goltz*, 111 S.W.3d at 6. Moreover, a prosecutor's comments in closing argument should not "reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." *State v. Gann*, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In *Judge v. State*, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the improper conduct of a prosecutor affected the verdict to the prejudice of the defendant: (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Id.* at 344. To merit a new trial, "the argument must be so inflammatory or improper as to affect the verdict." *Gann*, 251 S.W.3d at 459 (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)).

The following exchange occurred at trial in relation to comment 16:

[General Barnard]: . . . *Alicia Lipscomb. I've run into Alicia before—*

[Defense Counsel]: Judge, I'm going to have to object. I know this is closing statement.

[Trial Court]: Yes. That's not in the evidence. That's beyond what's in the evidence, General.

[General Barnard]: Yes, sir.

As recognized by the trial court, the prosecutor's comment was improper as it related to facts outside of the record that were not common public knowledge. *See Goltz*, 111 S.W.3d at 6. We conclude, however, that the statement did not affect the jury's verdict to the prejudice of the Defendant. The prosecutor was cut off mid-comment by the Defendant's objection, and the trial court sustained the objection before he said anything meaningful about Ms. Lipscomb. Although the trial court did not give a curative instruction, the Defendant did not request such an instruction, and given the incomplete nature of the remark, we do not believe that the trial court was obligated to give one. Viewed in context and in light of the facts and circumstances of the case, comment 16 did not alter the jury's verdict to the prejudice of the Defendant and does not constitute reversible error.

## 2. Plain Error Analysis

In *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court listed five factors to be applied to determine when alleged trial error constitutes "plain error":

> a) the record must clearly establish what occurred at trial; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

*Adkisson*, 899 S.W.2d at 641-42. In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court "formally" adopted this analysis, stating that "the *Adkisson* test provides a clear and meaningful standard for considering whether a trial error rises to the level of plain error in the absence of an objection[.]" In order to be entitled to plain error relief, all five factors must be established, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. Further, "'the plain error must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting

- 12 -

*Adkisson*, 899 S.W.2d at 642). The Defendant bears the burden of persuading the appellate court that the trial court committed plain error. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

### a. Voir Dire[8]

The record contains the transcript of the jury voir dire, during which comment 1 occurred, and clearly establishes the context in which the prosecutor made the challenged statement. Specifically, the transcript shows that the prosecutor was attempting to determine whether potential jurors could be fair and impartial when the sexual abuse victims who were going to be called to testify were two small girls. Following the prosecutor's comment, several potential jurors indicated that they would have problems remaining impartial because they had small children at home. As the main goal of voir dire is to bring to light areas of juror bias, the Defendant has not established that the prosecutor's comment when viewed in proper context violated a clear and unequivocal rule of law. *See State v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993) (stating that "[t]he ultimate goal of voir dire is to see that jurors are competent, unbiased, and impartial"). Moreover, the Defendant has not shown that he did not waive the issue for tactical reasons. From the prosecutor's comments and questions, the Defendant stood to gain relevant information from jurors regarding their potential bias in favor of the victims. The Defendant has failed to establish plain error.

### b. Opening Statement

The Defendant contends that comments 2 and 3, made by the prosecutor in opening statement, were designed to provoke the passions and prejudice of the jury. The Defendant further argues that, in comment 3, the prosecutor sought "to have the jury penalize the Defendant for exercising his right to trial . . . by inferring that the Defendant [did] not have a right to challenge the testimony of the alleged victims" and "directly attack[ed] [d]efense [c]ounsel[,] setting him up as the bad guy who should be ignored because he wants to hurt the children." Neither statement, however, referred to the Defendant or defense counsel. *See e.g., State v. Adam Wayne Robinson*, No. M2013-02703-CCA-R3-CD, 2015 WL 3877705, at *13-18 (Tenn. Crim. App. June 23, 2015) (finding plain error where the prosecutor explicitly and repeatedly berated defense counsel). We agree with the State that the comments were "generic and commonplace observation[s] by the prosecutor that it will likely be difficult for young children to testify in a case involving child rape." Thus, we cannot conclude that these comments constitute

---

[8] For the purpose of organizing our discussion on the remaining claims, we have grouped the prosecutors' comments based on when the statements were made at trial.

error "of such a great magnitude that it probably changed the outcome of the trial." *Smith*, 24 S.W.3d at 283.

### *c. Cross-Examination of Defense Witnesses*

At trial, the Defendant objected to comment 4 based on the "volume" of the prosecutor's voice, asserting that the volume was "bordering on intimidation . . . or arguing with the witness." The trial court instructed the prosecutor that "[t]he volume needs to go down a little bit" but overruled the objection in terms of the content of the prosecutor's question. Presumably, as the Defendant made no other such objection, the prosecutor lowered his voice during further cross-examination. When the Defendant objected to comment 5, the prosecutor immediately stated that defense counsel was "correct" and withdrew the comment. The trial court then instructed the jury to disregard the prosecutor's remark. In both instances, sufficient curative measures were undertaken by the trial court and the prosecutor, and the Defendant received the relief he requested. No substantial right of the Defendant was adversely affected, and therefore, the Defendant has not established plain error.

### *d. Closing Argument*

In his brief, the Defendant argues that, during closing argument, prosecutors: (1) improperly ingratiated themselves with the jury in comment 6; (2) made unfair attacks on defense counsel or defense tactics in comments 7, 13, and 14; (3) invited the jury to consider facts not in evidence in comments 8 and 12; and (4) attempted to inflame the passions of the jury in comments and expressed personal opinions on the credibility of witnesses in comments 9-11 and 15.

We carefully have reviewed the State's closing arguments at trial with these points in mind. Regarding comment 6, the Defendant contends that the prosecutor made the comment to ingratiate himself with the jury. However, the Defendant presents no authority for the proposition that prosecutors are not permitted to be friendly to juries during closing arguments, and in his brief, the Defendant acknowledges that, on its own, the comment "would not have been prejudicial."[9] The Defendant has not shown that comment 6 was improper, that he did not waive his objection for a tactical reason, or that the comment in any way resulted in plain error. In comments 8 and 12, prosecutors were attempting to respond to the Defendant's repeated assertions that the victims' mother made up the allegations in order to "put him in jail," by arguing that the victims' mother would not have had enough time to provide B.W. and A.W. with the details of their

---

[9] We note that, during closing argument, defense counsel likewise thanked the jury for their attention to his argument.

allegations. We believe the prosecutors' statements were fair comments based on reasonable inferences from the proof. To the extent that the remarks referenced any fact outside the record, defense counsel's closing argument reiterated that initially the victims did not provide descriptions of the abuse as detailed as their trial testimony. While we agree with the Defendant that comment 7 reflected unfavorably on the trial tactics employed by the defense and the prosecutor's comments 10 and 11, about how the victims' testimony "tore [him] up," could be seen as the prosecutor expressing a personal belief in the truth of the evidence, when viewed in context and in light of the record as a whole, the statements were not so improper that they affected the jury's verdict. Accordingly, consideration of the claims is not necessary to do substantial justice, and the Defendant is not entitled to plain error relief.

### B. Irregularities in Jury Selection

The Defendant also asserts that he was denied due process, the right to an impartial jury, and the right to a fair trial based upon the cumulative effect of several "irregularities" that occurred in the jury selection process, resulting in structural constitutional error. Specifically, the Defendant argues that his rights were denied by the trial court's use of the same jury panel for another rape trial. The State responds that the Defendant has failed to show any error in the makeup of the jury panel.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution both guarantee the accused the right to trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. The guarantee in the Tennessee Constitution has been interpreted to mean a jury free from "disqualification on account of some bias or partiality toward one side or the other of the litigation." *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003) (quoting *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993)). Bias is "a leaning of the mind; propensity or prepossession towards an object or view, not leaving the mind indifferent; a bent; for inclination." *Id.* "The ultimate goal of voir dire is to see that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." *Howell*, 868 S.W.2d at 247 (citing *State v. Harris*, 839 S.W.2d 54, 65 (Tenn. 1992); *State v. Simon*, 635 S.W.2d 498, 508 (Tenn. 1982)). Peremptory challenges are intended to exclude jurors "suspected of bias or prejudice," while the challenge for cause should be used to exclude potential jurors "whose bias or prejudice rendered them unfit." *State v. Pamplin*, 138 S.W.3d 283, 285-86 (Tenn. Crim. App. 2003) (quoting *Manning v. State*, 292 S.W. 451, 455 (Tenn. 1927) (internal quotation marks omitted). A trial court's decisions regarding juror qualifications are reviewed for an abuse of discretion. S*tate v. Hugueley*, 185 S.W.3d 356, 378 (Tenn. 2006); *State v. Mickens*, 123 S.W.3d 355, 375 (Tenn. Crim. App. 2003).

- 15 -

The trial court's decision will not be reversed absent "manifest error." *Howell*, 868 S.W.2d at 248.

Tennessee Rule of Criminal Procedure 24(b)-(c) governs voir dire and provides:

(b) Questioning Potential Jurors.

(1) Questioning Jurors by Court and Counsel. The court may ask potential jurors appropriate questions regarding their qualifications to serve as jurors in the case. It shall permit the parties to ask questions for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges.

(2) Questioning Outside Presence of Other Jurors. On motion of a party or its own initiative, the court may direct that any portion of the questioning of a prospective juror be conducted out of the presence of the tentatively selected jurors and other prospective jurors.

(c) Challenges for Cause.

(1) Procedures. After examination of any juror, the judge shall excuse that juror from the trial of the case if the court is of the opinion that there are grounds for challenge for cause. After the court has tentatively determined that the jury meets the prescribed qualifications, counsel may conduct further examination and, alternately, may exercise challenges for cause.

(2) Grounds. Any party may challenge a prospective juror for cause if:

(A) Cause Provided by Law. There exists any ground for challenge for cause provided by law;

(B) Exposure to Information. The prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. The court shall consider both the degree of exposure and the prospective juror's testimony as to his or her state of mind. A prospective juror who states that he or she will be unable to overcome preconceptions is subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so

prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability depends on whether the court believes the testimony as to impartiality. A prospective juror who admits to having formed an opinion about the case is subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

Tenn. R. Crim. P. 24(b)-(c). "Jurors need not be totally ignorant of the facts of the case on which they sit [and] [e]ven the formation of an opinion on the merits will not disqualify a juror if [he] can lay aside [his] opinion and render a verdict based on the evidence presented in court." *Howell*, 868 S.W.2d at 249 (quoting *State v. Sammons*, 656 S.W.2d 862, 869 (Tenn. Crim. App. 1982)).

### *1. Same Jury Panel*

The Defendant first argues that his rights were denied when the trial court used the same jury panel in selecting the Defendant's jury as was used for a rape trial the previous week. The Defendant asserts that an "[i]nordinate amount of jurors"[10] from the previous trial, in which the jury returned a verdict for the State, were among the first thirty-one names called by the trial court at the beginning of jury selection. The Defendant argues that he was thus "forced to use six of his [ten] peremptory challenges" to strike jurors from the prior trial. Moreover, because he used his four remaining challenges to strike other jurors and the trial court refused to strike Juror Derryberry for cause, he "had no other choice but to accept [Juror] Derryberry who had served on the [previous trial's] jury." The Defendant also contends that both the prosecutors and the trial judge referred to the previous jury "in very ingratiating and complimentary ways," making the potential jurors partial to the State.

Initially, we note that the Defendant did not object to any of the references to the previous jury about which he now complains. Moreover, the Defendant has cited no statute, case law, or rule of court to support his proposition that it is inappropriate for a jury panel to hear more than one case with the same or similar charges. This court has rejected arguments similar to the Defendant's in the past. In *Trail v. State*, 526 S.W.2d 127, 129 (Tenn. Crim. App. 1974), the defendant argued that "he was denied an impartial trial because some of the jurors in his case had heard an earlier, similar and related case." Quoting our supreme court, we found the defendant's claim to be meritless, explaining:

---

[10] Specifically, the Defendant contends that seven of the first thirty-one potential jurors served on the previous week's trial.

Since the record in the case before the Court does not show that any of the members of the jury in this case had formed or expressed any opinion as to the guilt or innocence of the defendants of the offense being tried, or of any other offense on the part of either of them, the mere fact that they had heard testimony given in the trial of these defendants on another offense would not of itself disqualify the jurors.

*Id.* (quoting *Warden v. State*, 381 S.W.2d 247, 250 (Tenn. 1964) (internal quotation marks omitted).

In this case, the record does not show that any juror was biased or prejudiced; therefore, we conclude that the trial court did not abuse its discretion by not excusing Juror Derryberry for cause. *See State v. Montez Antuan Adams,* No. 02C01-9709-CC-00352, 1998 WL 556174, at *5-6 (Tenn. Crim. App. Sept. 1, 1998) (concluding that the trial court did not abuse its discretion when the jury had previously been seated for a similar case because "[t]he record reveals nothing that would call into question the impartiality of a particular juror"), *perm. app. denied* (Tenn. Apr. 5, 1999); *State v. Perry McIntosh,* No. 88-230-III, 1989 WL 12339, at *2 (Tenn. Crim. App. Feb. 16, 1989) (denying relief where the defendant failed to present "any evidence that the jury did not consider the case on its own merits[]" when members of the jury had previously deliberated on a factually similar case), *perm. app. denied* (Tenn. June 5, 1989).

### *2. Trial Court's Improper Rehabilitation of a Potential Juror*

The Defendant asserts that the trial court abused its discretion when it rehabilitated a potential juror, after she initially stated that she could not be fair, and that the trial court should have excused the juror for cause. He argues that the trial court and the prosecutor "cajoled" the potential juror into saying that she could be fair.

During voir dire, four potential jurors initially questioned their ability to be fair and impartial due to the nature of the Defendant's charges.[11] During further questioning by the trial court and parties, the following exchange occurred with one of the potential jurors, Ms. Brown:[12]

THE COURT: . . . Ms. Brown, let me remind you that all we're looking for is the truth. That's the difference between a right and a wrong answer here is just that.

---

[11] The trial court ultimately excused three of these jurors for cause.

[12] It is unclear from the record what Ms. Brown's initial response was when the prosecutor asked potential jurors if they could be fair and impartial.

- 18 -

POTENTIAL JUROR: Yes, sir.

THE COURT: And to the extent that you know what the complete truth is, we need for you to tell us what's in your heart. And as already has been said, you're the only one who knows. You're the only witness to this proposition, and maybe you don't fully know. Sometimes that happens with jurors, but do you feel that you could be fair to both sides that you can require the State to meet its burden of proof beyond a reasonable doubt in this case or do you have doubt about your ability to do that because of the nature of the charges?

POTENTIAL JUROR: That's what I'm saying, it's a hard thing, the children, and knowing what's being accused. And I will try my best to be fair.

THE COURT: Okay.

POTENTIAL JUROR: If at all possible, in my heart, I'll try.

THE COURT: In your mind, is there some doubt about your ability to do that?

POTENTIAL JUROR: It's—it's—my mind is going I want to, and I don't either. So it's kind of like an argument that I'll try my best to be fair, but still it's got to get to you.

THE COURT: And it will be hard to sit through proof on this subject, and that will be true of whoever the 14 people are. Nobody for one minute thinks this will be an easy case to sit through. That's a little different from the question that's really here, and that is whether or not you believe that no matter how difficult it will be to listen to this subject matter, can you be fair to both sides? Let me say this, and we'll get you to answer that question, the sexual abuse of a child is a horrible thing. Also a horrible thing would be for someone not guilty of that horrible crime to be convicted of it. Those are two horrors in my mind, and I don't think there's any reason to try to compare the two horrors or to even have an opinion on which is worse or better. I think it would just be very bad any time a child is sexually abused, and it would be bad any time an innocent person was convicted of that particular crime. So that's the reason we go through all this rigmarole to try to get 14 people who can be fair to both sides, and

- 19 -

ultimately 12 people. So even though it's going to be difficult, do you . . . believe in your heart that you can be fair to both sides?

POTENTIAL JUROR: I believe I can.

….

[DEFENSE COUNSEL]: Ms. Brown, do you understand my hesitation to believe your certainty of that at this point?

POTENTIAL JUROR: Yes. Because I just contradicted myself, yes.

[DEFENSE COUNSEL]: Right. A few minutes ago you had decided you could not be fair, is that fair to say?

POTENTIAL JUROR: Like I said, there was—there was a—there's a right and wrong in everything, but when it comes down to it, I believe I could, yes.

[DEFENSE COUNSEL]: My memory is [General] Barnard asked you the question, do you believe you could not be fair, because—

POTENTIAL JUROR: Yes.

[DEFENSE COUNSEL]: —of the children, and you raised your hand.

POTENTIAL JUROR: Yes.
[DEFENSE COUNSEL]: So are you saying at that point you weren't sure or at that moment in time you thought you could not be fair?

POTENTIAL JUROR: I wasn't sure if I could or could not, right.

[DEFENSE COUNSEL]: Judge, I have no further questions, I do move for cause, I think.

….

[DEFENSE COUNSEL]: . . . I just think it's too equivocal. I feel, to put it bluntly, I don't think anyone is doing this on purpose, but I felt like she was being talked into saying she could be fair. She was so equivocal at the end, and I think the record shows that first she pretty much indicated she did not

think she could be, was not confident she could be. So I would move for cause, and I'll leave it at that, Judge.

….

THE COURT: And I believe that that is where she was. I think she was struggling to make a decision. I think she was to some degree at first confusing two issues, is it going to be hard to sit through a case like this. She definitely came to that conclusion. She's right and everybody in that venire would say the same thing. It's a tough subject matter to sit through. It's not something you want to sit and hear three days about, but I think she has told us and she seemed quite sincere in saying that she has come to the conclusion that she can be fair to both sides, and I believe she can. I think it helps to look at both sides of the coin. Yes. It's a horrible thing for a child to be sexually abused. And, yes, sir, it's a horrible thing to convict somebody of that charge unless they've been proven guilty beyond a reasonable doubt. To convict an innocent person of that charge is the other big horror that always haunts this kind of case. So I don't know if that is what [defense counsel] felt was moving her in the direction of being able to say, but I think it's important for them to consider both sides of that, both sides of that. So respectfully, I'm going to leave her in the venire.

Upon review, we conclude that the trial court did not abuse its discretion by not excusing Ms. Brown for cause. However, irrespective of whether the trial court should have excluded Ms. Brown for cause, any error is harmless "unless the jury who heard the case was not fair and impartial." *Howell*, 868 S.W.2d at 248 (citing *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989)). If a defendant disagrees with a trial court's ruling on a challenge for cause, the defendant must, "in order to preserve the claim that the ruling deprived him of a fair trial, exercise peremptory challenges to remove the juror." *Id.* "[T]he failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him." *Id.* (citing *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988); *State v. Jones*, 789 S.W.2d 545, 549 (Tenn. 1990)).

In this case, the Defendant exercised all of his peremptory challenges and struck Ms. Brown, and she did not serve on the jury. Accordingly, any error in refusing to excuse Ms. Brown for cause in and of itself does not entitle the defendant to a new trial unless the jury that ultimately heard the case was not fair and impartial. *Thompson*, 768 S.W.2d at 246. The record does not support the Defendant's contention that an unfair or impartial juror was forced upon him. This issue is without merit.

- 21 -

### 3. Trial Court's Failure to Allow Additional Peremptory Challenges

Following several rounds of peremptory strikes, the Defendant asked the trial court for additional peremptory strikes, which the trial court denied. On appeal, the Defendant asserts that he was unable to strike Juror Derryberry because he exhausted his peremptory challenges "[d]ue to the large number of jurors on the trial the week before . . . and the [trial] court refusing to strike for cause [Ms.] Brown." He contends that in this case "due process demanded that he be provided additional strikes[,]" and that the trial court abused its discretion by denying his request.

The Defendant has not claimed, however, that he was denied the eight peremptory challenges permitted in felony cases by Rule 24(e)(2) of the Tennessee Rules of Criminal Procedure plus the two additional peremptory challenges to which the Defendant was entitled under Rule 24(e)(4), and he has cited no authority for the trial court to grant additional peremptory challenges. *See Ross*, 487 U.S. at 89 (holding that the right to peremptory challenges is "denied or impaired" only when a defendant does not receive that which the state law permits). Moreover, there is "no evidence that the jury which ultimately heard the case was unfair or partial." *Howell*, 868 S.W.2d at 248. Accordingly, the Defendant is not entitled to relief.

### 4. Juror Leonard's Failure to Disclose Employment Application During Voir Dire

Prior to trial, the parties obtained a voir dire report, which listed Juror Leonard as a potential juror and stated that he worked as a dispatcher for the City of Lewisburg Police Department. During voir dire, Juror Leonard stated that he "kn[e]w the city officer." The following exchange then took place:

> [DEFENSE COUNSEL]: In the capacity as a police officer or do you know them personally?
>
> [JUROR LEONARD]: I was a dispatcher with the City of Lewisburg.
>
> [DEFENSE COUNSEL]: Okay. Thank you. That's all, thank you.

On appeal, the Defendant contends that Juror Leonard held back material information of his "connect[ion] with law enforcement" during voir dire when he failed to disclose that he had applied for a position with the Marshall County Sheriff's Office. The Defendant further asserts that the trial court improperly refused to provide him "with the ability to obtain and present [Juror] Leonard's application for employment to the [s]heriff's [o]ffice."

Voir dire allows for the impaneling of a fair and impartial jury through questions that permit counsel to intelligently exercise challenges. *Akins*, 867 S.W.2d at 354. Full knowledge of the facts that might bear upon a juror's qualifications is essential to the intelligent exercise of preemptory and cause challenges. *Id.* at 355. Jurors, therefore, are obligated to make "full and truthful answers . . . neither falsely stating any fact nor concealing any material matter." *Id.* (quoting 47 Am. Jur. 2d, Jury § 208 (1969)) (internal quotations marks omitted). When a juror willfully conceals or fails to disclose information during voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises. *Id.* (citing *Durham v. State*, 188 S.W.2d 555, 559 (Tenn. 1945)). The presumption of prejudice, however, may be dispelled by an absence of actual favor or partiality by the juror. *See State v. Taylor*, 669, S.W.2d 694, 700 (Tenn. Crim. App. 1983). The defendant bears the burden of proving a prima facie case of bias or partiality. *Akins*, 867 S.W.2d at 355 (citing *Taylor*, 669 S.W.2d at 700).

Here, the Defendant has failed to establish that Juror Leonard willfully concealed or failed to disclose information tending to indicate a lack of impartiality. During voir dire, when Juror Leonard responded in the past tense that he "*was* a dispatcher with the City of Lewisburg," the Defendant asked no further questions about Juror Leonard's employment or involvement with law enforcement. At the motion for new trial hearing, Juror Leonard testified that he did not begin working for the sheriff's office until October 2015—two months after the Defendant's trial. Moreover, Juror Leonard stated that he did not recall making any inquires about the position with the sheriff's office before the trial. Thus, the Defendant's claim that Juror Leonard willfully failed to disclose his connection to law enforcement is wholly unsubstantiated.

At the conclusion of the motion for new trial hearing, the Defendant requested that the trial court allow him to obtain and supplement the record with Juror Leonard's personnel file from the sheriff's office. The State objected, and the trial court denied the Defendant's request to supplement the record after the hearing based on the trial court's recollection of voir dire.[13] However, the trial court explained to the Defendant that, if the voir dire transcript showed that Juror Leonard had been asked about applying to work in law enforcement, the trial court would reopen the record and "revisit the issue." The transcript does not reflect that Juror Leonard was asked whether he currently worked in law enforcement or had applied to do so, and the Defendant never requested that the trial court reopen proof based upon a review of the transcript. Under these circumstances, we conclude that the trial court did not err in denying the Defendant's request for a post-hearing supplementation of the record with Juror Leonard's personnel file.

---

[13] Trial transcripts had not been prepared by the time of the motion for new trial hearing.

### *C. Cumulative Error*

The Defendant also contends that the cumulative effect of the errors at trial requires reversal. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). However, circumstances warranting the application of the cumulative error doctrine to reverse a defendant's conviction are rare. *Id.* To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. Having found no error in the trial proceedings, we need not consider the cumulative effect of the alleged errors.

### III. Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE